[Cite as *State v. Belmon*, 2025-Ohio-4400.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-23-1296

    Appellee                                      Trial Court No. CR0202301156

v.

Cedrick Belmon, Jr.                                   **DECISION AND JUDGMENT**

    Appellant                                     Decided:  September 19, 2025

* * * * *

Julia R. Bates, Esq., Lucas County Prosecutor and
David J. Borell, Jr., Assistant Prosecuting Attorney.

David Klucas, Esq., for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Cedrick Belmon Jr., appeals the

November 17, 2023 judgment of the Lucas County Court of Common Pleas, convicting

him of murder and other felonies stemming from the July 29, 2022 shooting death of

D.B. For the reasons that follow, we reverse the trial court judgment and remand the matter for a new trial.

## I. Background

{¶ 2} On February 1, 2023, Cedrick Belmon, Jr. was charged with one count of murder, a violation of R.C. 2903.02(B), an unclassified felony (Count 1); two counts of felonious assault, violations of R.C. 2903.11(A)(2), felonies of the second degree (Counts 2 and 3); one count of discharging a firearm on or near prohibited premises, a violation of R.C. 2923.162(A)(3) and (C)(4), a felony of the first degree (Count 4); one count of having weapons under disability, a violation of R.C. 2923.13(A)(2) and (B), a felony of the third degree (Count 5); and one count of tampering with evidence, a violation of R.C. 2921.12(A)(1) and (B), a felony of the third degree (Count 6). Counts 1 through 4 carried with them attendant firearms specifications under R.C. 2941.145(A), (B), (C), and (F).

{¶ 3} These charges arose from the July 29, 2022 shooting death of D.B. As we will explain below, a detailed recitation of the facts is unnecessary to our analysis here. Very briefly summarized, D.B. and M.O. were traveling in a vehicle near the corner of Byrne Road and Gibralter Heights—near Hunter's Ridge Apartments—when a bullet came through the windshield, striking and killing the driver, D.B. The State maintained that Belmon fired the fatal shot. The matter was tried to a jury, which found Belmon guilty of all counts, and the trial court sentenced Belmon to an aggregate prison term of 37 years to life in prison, with eligibility for parole after 25 years.

2.

**{¶ 4}** Belmon appealed.  He assigns the following errors for our review:

1. The trial court committed reversible error by permitting the State to introduce evidence of uncharged misconduct by Mr. Belmon offered to prove conforming conduct.

2. The trial court committed reversible error when it denied Mr. Belmon the opportunity to examine prospective jurors on the issue of race.

3. Mr. Belmon did not receive constitutionally effective assistance of counsel.

4. The trial court committed reversible error when it admitted testimonial statements of out of court declarants whom Mr. Belmon could not cross examine.

5. Mr. Belmon's conviction for tampering with evidence is not supported by sufficient evidence.

6. Cumulative error throughout the trial denied Mr. Belmon a fair trial.

7. The trial court committed reversible error by imposing discretionary monetary sanctions after sentencing Mr. Belmon to life in prison with parole eligibility after 37 years.

## II. Law and Analysis

**{¶ 5}** Belmon assigns numerous errors here, including errors in the improper admission of other-acts evidence, unreasonable limitations on the scope of voir dire, ineffective assistance of counsel, confrontation-clause violations, the State's failure to produce sufficient evidence to support his conviction of tampering with evidence, and error in the imposition of discretionary costs.  We find merit to Belmon's challenge to the unreasonable limitation on the scope of voir dire—his second assignment of error— thereby obviating the need for us to consider his remaining assignments of error, save his

3.

fifth assignment of error, challenging the sufficiency of the evidence supporting his tampering-with-evidence conviction. Given the narrowness of Belmon's sufficiency challenge, a detailed recitation of the trial evidence is unnecessary.

## A. Voir Dire

{¶ 6} Belmon, his trial attorney, and the victim are all African-American. During voir dire, trial counsel sought to examine the venire concerning potential racial bias. The trial court cut this examination short, accusing counsel of making this "a race case" and declaring that it would not allow defense counsel to turn this "into a racial incident" because both the defendant and the victim were black. In his second assignment of error, Belmon argues that the trial court committed reversible error. He maintains that the trial court ignored the fact that racial bias can materialize even in the absence of a cross-racial crime and unreasonably foreclosed examination on an appropriate topic of potential juror bias.

{¶ 7} During voir dire, defense counsel asked pointed questions to ascertain whether the prospective jurors harbored any racial biases that would prevent them from being fair and impartial. He first asked the prospective jurors if they would have an issue listening to him, a person of color. No one indicated that this would be problematic.

{¶ 8} Defense counsel then asked the prospective jurors to share experiences where they had been stereotyped based on race, gender, or religion. One prospective juror described an incident he experienced in Philadelphia in the 1970s, which he characterized as "reverse discrimination." He explained that his predominantly-white

4.

basketball team won a game against a predominantly-black basketball team. After the game, he was one of four white people waiting for a train in a crowd of 50 people and was punched in the mouth by a black man. This prospective juror also described an incident at work where he was leading a group counseling session, a black attendee arrived late, he did not acknowledge the black attendee's arrival, and the black attendee accused him of being racist. This personal exchange with the prospective juror ultimately culminated in the prospective juror sharing his disdain for gun violence and led him to disclose that he did not believe that he could be fair and impartial in this case.

{¶ 9} Defense counsel next asked the potential jurors if any of them "get nervous or apprehensive when interacting with a minority or black person." At least one juror raised his hand, but the trial court ordered counsel to approach the bench. At the bench, the court admonished defense counsel that "[w]e're not turning this trial into a racial incident." Defense counsel responded that his questions were intended to elicit whether the jurors held potential biases. The State's attorney questioned why they had to "go down this road of race" given that both the defendant and the victim were black. The court agreed with the State and told defense counsel that if he was trying to ask if the jurors are biased because Belmon is black, "that's disingenuous because the victim was also black."

{¶ 10} The conversation at the bench grew more contentious. Counsel for the State "suggested that [they] go into chambers to discuss the issue of [inappropriately] turning this voir dire into an examination on race." The court shared the State's view that

defense counsel was unnecessarily "creating an issue . . . of race." Defense counsel again explained that he was "trying to get at the potential bias related . . . to [his] race or to [his] client's race." The court told him to ask different questions because he was "making race an issue." It instructed that he was "not limited in [his] questioning as it relates to bias," but was "limited in [his] questioning as to making this a race case."

{¶ 11} Thereafter, defense counsel was prohibited from asking any additional questions relating to racial prejudice, however, the trial court invited a prospective juror to come into chambers to explain why he raised his hand in response to defense counsel's last question. That prospective juror stated that he did not intend to discriminate against anyone, but said that in his job managing a Family Dollar store, he had observed that 90 percent of criminal activity in the store is committed by African-Americans. The parties then picked a jury without any additional voir dire.

{¶ 12} The Sixth Amendment to the U.S. Constitution affords a defendant the right to a trial by a fair and impartial jury. *State v. Jackson*, 2005-Ohio-5981, ¶ 56, quoting *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). *See also State v. Froman*, 2020-Ohio-4523, ¶ 49 ("Pursuant to the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed the right to an impartial and unbiased jury."). "The purpose of voir dire . . . is to discover whether any juror has a bias that would prevent him or her from individually weighing the facts of the case." *State v. Madison,* 2020-Ohio-3735, ¶ 20. A biased juror may be challenged for cause. Crim.R. 24(C)(9). While the Constitution does not dictate how voir dire must be conducted, it is well-recognized that

6.

"part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Jackson* at ¶ 56.

{¶ 13} R.C. 2945.27 and Crim.R. 24 set forth the general procedure for conducting voir dire in Ohio. Under R.C. 2945.27, the trial judge must "examine the prospective jurors under oath or upon affirmation as to their qualifications to serve as fair and impartial jurors" and "permit reasonable examination of such jurors by the prosecuting attorney and by the defendant or his counsel." Crim.R. 24 similarly requires that "[a]ny person called as a prospective juror for the trial of any cause shall be examined under oath or upon affirmation as to the prospective juror's qualifications," and where the court conducts the examination itself, it must permit defense counsel and counsel for the State to supplement the examination by further inquiry.

{¶ 14} Belmon argues that the trial court denied him a meaningful opportunity to examine potential jurors for racial bias. He points out that the information elicited during his limited voir dire led to one juror admitting that he could not be fair and impartial, and he insists that additional questioning should have been permitted. The State responds that race was not a motivating factor in D.B.'s murder, thus there was no reasonable probability that racial prejudice may have influenced the jury.

{¶ 15} "[T]he scope of voir dire falls within the trial court's sound discretion and varies depending on the circumstances of a given case." *State v. Ford*, 2019-Ohio-4539, ¶ 144, citing *State v. LaMar*, 2002-Ohio-2128, ¶ 40. "Absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire." *State v. Were*,

7.

2008-Ohio-2762, ¶ 78, quoting *Jackson*, 2005-Ohio-5981, at ¶ 28. "A trial court does not abuse its discretion unless it acts arbitrarily, unreasonably, or unconscionably." *LaMar* at ¶ 40, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 16} "Questions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors." *Jackson* at ¶ 57, citing *Morgan* at 734-735. Without adequate *voir dire,* a trial judge cannot fulfill his or her responsibility to remove prospective jurors who cannot impartially evaluate the evidence and follow the court's instructions. *Id.* at ¶ 56, quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). And given that the defendant bears the burden to establish juror partiality, it is imperative that he or she be allowed "meaningful examination" to "elicit potential biases held by prospective jurors." *Id.* at ¶ 57, citing *Mu'Min v. Virginia*, 500 U.S. 415, 441 (Marshall, J., dissenting). "[T]he trial court's discretion to restrict inquiry is subject to the essential demands of fairness." *Id.* at ¶ 56, quoting *Morgan* at 730. Any "limits on voir dire must be reasonable." *Id.* at ¶ 48.

{¶ 17} "[R]acial, ethnic, or religious biases are realities in our society and are proper subjects of voir dire inquiry." *State v. Rodgers*, 2008-Ohio-2757, ¶ 95 (11th Dist.), quoting *State v. Jones*, 20 Ohio App.3d 331, 332 (1st Dist. 1984). As such, it is proper for defense counsel to pose questions to prospective jurors "designed to elicit the existence of bias on the basis of race." *Id.* at ¶ 94. *See also Gomez v. United States*, 490 U.S. 858, 873 (1989) ("Jury selection is the primary means by which a court may enforce

8.

a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice or predisposition about the defendant's culpability.").

{¶ 18} As argued by Belmon—and contrary to the position of the trial court and the State's attorney—racial bias may prevent a juror from being impartial even where the defendant and victim are of the same race; a cross-racial crime is not a prerequisite for racial prejudice. Here, defense counsel's questions were aimed at determining whether any prospective jurors harbored racial biases that would prevent Belmon from receiving a fair trial by an impartial jury. Indeed, counsel's questions produced responses that warranted further inquiry. By interrupting this line of examination and prohibiting defense counsel from exploring this topic, the trial court unreasonably interfered with Belmon's ability to identify prospective jurors incapable of impartiality. *See Jackson* at ¶ 58, quoting *Oswald v. Bertrand,* 374 F.3d 475, 480 (7th Cir. 2004) ("The greater the probability of bias, 'the more searching the inquiry needed to make reasonably sure that an unbiased jury is impaneled.'"). Belmon was denied the opportunity to fully explore potential juror bias, and any claim that additional questioning would have been fruitless is speculative at best.

{¶ 19} Because the trial court prevented inquiry on the topic of racial bias, we find that it abused its discretion and committed prejudicial error requiring reversal. *See Jones* at 332 ("[A] clear abuse of discretion occurs where a total preclusion or foreclosure of good faith voir dire examination as to biases is imposed, and such abuse of discretion is reversible error."); *State v. Abuzahrieh*, 2003-Ohio-6639, ¶ 14 (8th Dist.) (acknowledging

9.

that trial court's restriction of counsel's participation in voir dire may constitute prejudicial error requiring reversal, including where defendant is prevented from conducting inquiry on voir dire).

{¶ 20} Accordingly, we find Belmon's second assignment of error well-taken. We reverse his convictions and remand for a new trial. This conclusion renders moot all but Belmon's fifth assignment of error challenging the sufficiency of his tampering-with-evidence conviction. *See State v. Gideon*, 2020-Ohio-6961, ¶ 27, quoting *State v. Mathis*, 2020-Ohio-3068, ¶ 78 (6th Dist.) ("Because the state is not entitled to retry a criminal defendant after reversal for trial court error if the state failed in the first instance to present sufficient evidence . . . a defendant's assigned error that the conviction is based on insufficient evidence is not moot under these circumstances." (Internal quotations omitted for readability.)).

### B. Sufficiency of the Evidence

{¶ 21} In his fifth assignment of error, Belmon argues that the evidence was insufficient to support his conviction of tampering with evidence. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not

10.

weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 22} Under R.C. 2921.12(A)(1), "[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall . . . [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."

Belmon argues that his tampering-with-evidence conviction was premised solely on the State's inability to produce the gun used to shoot D.B. He maintains that under Ohio case law, including *State v. Beard*, 2009-Ohio-4412, ¶ 20 (6th Dist.), where the only evidence of tampering is that the gun used in the shooting was never found, this evidence is insufficient to prove tampering with evidence.

{¶ 23} Belmon is correct that the State's inability to find a gun after a shooting, by itself, "cannot lead to an inference that [the defendant] tampered with it." *Id.* "[M]ore than a missing weapon is required to prove 'tampering.'" *Id.* at ¶ 18. But the State denies that its sole evidence of tampering was its inability to produce the gun used in the murder. It claims that video evidence presented at trial showed that approximately one hour after the shooting, Belmon was searching the area where the shooting occurred, then walked away from the scene carrying "something wrapped up" and was "carrying it in

11.

kind of a funny way." The State suggests that it was the gun wrapped up in the shirt.

One of the investigating detectives testified:

> Q: [D]uring the course of your investigation, . . . did you ever recover a firearm from the scene?
>
> A: No, we did not from the scene at all.
>
> Q: And during the course of your investigation, . . . did you uncover any surveillance footage that gave you an explanation as to why you did not recover a firearm that was used at the scene?
>
> . . .
>
> A: Yeah. I was able to find some footage from the same camera that we saw earlier and it showed at around I want to say right after eleven p.m., 2300 hours, it showed Mr. Belmon, Jr. walking away from the scene. He was heading towards Airport. He was heading out I guess from probably I would assume the front of FF2 or, I'm sorry, building FF, out towards South Byrne and it would be a northerly direction, so towards Airport. When he was walking away, he was carrying something wrapped up -- it looked like something was wrapped up in his arms. It was a piece of clothing and he was carrying it kind of in a funny way.

The State argues that the conclusion to be drawn is plain: "Appellant, having shot the victim, searched the area for evidence of his crime and then, knowing that an investigation would be forthcoming, concealed the firearm in an article of clothing and left the scene with it with the purpose of concealing it from police."

{¶ 24} The State claims that this case is more like *State v. Miller*, 2014-Ohio-2936 (7th Dist.). In *Miller,* the defendant stated that he left the victim's house with the gun, got in his truck, "dropped" the gun somewhere, and did not have it when he returned to his house. *Id.* at ¶ 130. The court found that a rational trier of fact could find that he

12.

removed and concealed the gun with a purpose to render it unavailable in the investigation. It concluded that there was sufficient evidence to support his tampering conviction.

{¶ 25} Here, the State presented evidence beyond just its inability to find the gun used to shoot D.B. The evidence presented by the State, if believed, could lead a rational juror to infer that Belmon returned to the scene of the shooting and removed the gun from the scene with the purpose to make it unavailable as evidence. Viewing this evidence in a light most favorable to the prosecution, it is sufficient to support Belmon's conviction of tampering with evidence.

{¶ 26} Accordingly, we find Belmon's fifth assignment of error not well-taken.

### III. Conclusion

{¶ 27} The trial court abused its discretion and committed prejudicial error requiring reversal when it prevented defense counsel from inquiring during voir dire on the topic of racial bias. We find Belmon's second assignment of error well-taken. The State presented sufficient evidence to support Belmon's conviction of tampering with evidence. We find his fifth assignment of error not well-taken. Given our resolution of Belmon's second assignment of error, we dismiss as moot his first, third, fourth, sixth, and seventh assignments of error.

{¶ 28} We reverse the November 17, 2023 judgment of the Lucas County Court of Common Pleas and remand this matter to the trial court for a new trial. The State is ordered to pay the costs of this appeal under App.R. 24.

JUDGMENT REVERSED<br>
AND REMANDED.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

           JUDGE

Christine E. Mayle, J.

           JUDGE

Charles E. Sulek, P.J.
CONCURS AND WRITES
SEPERATELY.

           JUDGE

**SULEK, P.J., concurring, in part.**

{¶ 29} I respectfully concur in the judgment reversing Belmon's conviction, and I join with the majority in finding the State produced sufficient evidence on the charge of tampering with evidence. I write separately because while I share some of the concerns of the majority regarding the trial court's limitation of voir dire, I believe that the State's improper admission of other-acts evidence is a more significant error in this case.

14.

{¶ 30} Specifically, I am less persuaded than the majority that the trial court's limitation of voir dire on the subject of racial bias was prejudicial. Indeed, of the two jurors that responded to counsel's questions, the one who observed that most of the crime committed at his store was done by "African Americans" stated that he could set that aside and decide the case solely on the evidence. He nonetheless was dismissed on a peremptory challenge. The other who offered his past experience with reverse discrimination was seated on the jury, but he confirmed that he could set that aside and be fair and impartial. His later indication that he could not be fair and impartial pertained to gun violence, not race. No other jurors responded to the two questions that counsel was permitted to ask, and there is no indication that further inquiry would have been fruitful.

{¶ 31} In contrast, I believe that plain error occurred when the State introduced other-acts evidence regarding Belmon's involvement in an unrelated shooting approximately two months prior to the events of this case. Given the remaining evidence produced at trial, I find this error to be highly prejudicial. Furthermore, I believe that this error is more likely to be repeated in a subsequent retrial. I, therefore, would find Belmon's first assignment of error well-taken and would reverse his conviction on those grounds.

{¶ 32} In resolving Belmon's first assignment of error, a detailed recitation of the facts is necessary. The charges in this case arose from a shooting that occurred on the evening of July 29, 2022, wherein Belmon allegedly went to the corner of the Hunter's

Ridge apartment complex and indiscriminately fired a gun down Byrne Road in Toledo, Lucas County, Ohio, tragically striking and killing a motorist.

{¶ 33} Kyle Harrison, a private security officer contracted by Hunter's Ridge, testified that on the night of July 29, 2022, he heard two gunshots towards the front of the property and responded. Upon arrival, he found a sedan that had rolled to a stop at the corner of Byrne Road and Gibralter Heights. One individual, later identified as the deceased victim's cousin, M.O., was outside of the car acting hysterically. Harrison pulled the victim, D.B., out of the car and another officer began chest compressions while Harrison called 911. D.B. had been shot once in the chest and died from his injuries.

{¶ 34} Harrison also testified regarding apartment FF2. He stated that it was one of the "problem units," and he was constantly there responding to calls or fights. He described that much of the trouble came from the friends of one of the residents, M.G. Those friends would often enter and exit through a bottom side window instead of using the door to the apartment building.

{¶ 35} Harrison further testified regarding an individual nicknamed "Flex." According to Harrison, he responded to one prior incident where FF2's occupant, B.B., told him that Flex had beat her, put a gun to her head, and then fled out of the bottom side window. Harrison testified that he was told that Flex's real name was Cedrick Belmon, Jr. Defense counsel objected at this point, to which the State said that it would move on, and the trial court said "All right" without ruling on the objection.

16.

{¶ 36} Harrison then testified that on the night of July 29, 2022, sometime after the shooting, he briefly saw Flex and M.G. outside of the apartment, asking him what had happened. Harrison responded that there had been a shooting. Flex and M.G. then asked to be let back into apartment building FF because they were locked out.

{¶ 37} On cross-examination, defense counsel asked Harrison about the results of the private security firm's investigation into the shooting. Harrison offered that from watching the surveillance footage and talking with other residents, they "deduced that the shooter did come out of FF, did come towards the window and did return back to the building from that window. And we also learned that the shooter went by the name of Flex." Harrison further clarified that the shooter returned to the window for unit FF2. Harrison personally did not recognize Belmon as "Flex" and had never heard anyone call Belmon "Flex."

{¶ 38} The State also called Dale Cliche, the Chief of Security for IDER Security Investigations, the private security company contracted by Hunter's Ridge apartments. Cliche watched the surveillance video the morning after the shooting. In it he saw "an individual come out of a bedroom window, go to Byrne [Road], the vehicle comes to a stop, that individual runs back along a wall there along the building, back into the same bedroom window that the individual had crawled out of." He further testified, "While watching that, we were able to identify that somebody who we had spoke with the prior night during the incident. We just didn't know who he was at that time. And that was a person by the name of Flex, is what we had known during that time." At this point,

17.

defense counsel objected that Cliche's testimony was speculation, which the trial court overruled.

{¶ 39} Cliche next testified that after the shooting, while crews and emergency responders were still on the scene, Flex and another resident asked the private security officers to let them back into the building because they were locked out.

{¶ 40} Cliche also investigated the social media accounts of apartment FF2's occupant, B.B., and another, unnamed individual who lived there. Through their social media profiles, Cliche searched for the name "Flex" and discovered several pictures of the same person who was present on the night of the shooting. Notably, Cliche testified that just a few days after the shooting, all of the social media accounts had been deleted.

{¶ 41} Cliche then recounted that a week before the shooting, B.B. reported to the security company that Flex had pulled a firearm on her and "beat her up." Cliche watched the surveillance video from that incident and saw an individual come down Byrne Road, cross over Gibraltar Heights, and jump in through the window into FF2.

{¶ 42} The State then played the surveillance video from the night of the shooting. In it, a dark silhouette of a person can be seen crossing in front of a window on building GG, heading towards Byrne Road, which is just beyond the corner of the building. Six seconds later, a silhouette can be seen going in the opposite direction. As that is happening, the victim's car slows to a stop on Byrne Road. Within one minute, the security team responds. Although Cliche testified that he could see an individual come out of a bedroom window and return through that window, the surveillance video does

18.

not show the window or show a person exiting or entering it.  Approximately one hour later, Flex can be seen walking across Gibraltar Heights towards Byrne Road.  In the video he is wearing a light-colored tank top and light-colored pants, is looking at his phone in his left hand, and is cradling a shirt or jacket in his right hand.  Cliche later identified Flex as Belmon.

{¶ 43} Detective Justin Hawkins of the Toledo Police Department testified that through the course of his investigation he learned that B.B. resided in FF2 with her friend M.G.  He also learned that Flex would frequent the apartment and that Flex was Belmon.  He further testified, over a hearsay objection, that he learned through interviews that Belmon would enter and exit FF2 through the window.  Hawkins testified that it was important that Belmon had a habit of entering and exiting through the window because "from reviewing the video, and obviously with the assistance from the security staff, and the knowledge of the incidents with FF2, it's apparent here that whoever was involved in this shooting exited the apartment FF2 through the window, went out to the corner and then entered back into the apartment of FF2."

{¶ 44} The State then played a short video from one of the police cruiser cameras that was taken at around 11:00 p.m., approximately one hour after the shooting.  In the video, Belmon can be seen standing outside of apartment building GG near Byrne Road, which is approximately the same area from which the shooter fired.  He is wearing black pants and a black tank top and is holding a red shirt in his right hand.  He has his phone out and turned on in his left hand, which he looks down at periodically.  The video shows

19.

Belmon standing and staring towards building GG for approximately 30 seconds. He then wanders down the side of building GG near Byrne Road, disappears from the camera for a few seconds, then wanders back into view and towards building FF. He then stops briefly, turns back towards building GG and appears to be looking down Byrne Road. After a few seconds, he leaves and walks back towards building FF. In total, the camera shows Belmon outside for approximately 1 minute and 30 seconds.

{¶ 45} Regarding the cruiser video, Hawkins testified that it looked to him "like Mr. Belmon knew he had done something wrong and if he has any knowledge of firearms, he knows when a gun is fired there's going to be evidence that gets left, shell casings, and looked to me like he maybe was out there trying to locate those."

{¶ 46} Three minutes after he was seen on the cruiser camera, surveillance video shows Belmon walking from the direction of building FF, across Gibraltar Heights to the north towards the intersection of Byrne Road and Airport Highway. In the surveillance video—which was also shown during Cliche's testimony—he is seen wearing light colored pants, a light tank top, and is carrying what appears to be a light-colored sweatshirt cradled in his right arm. Belmon is holding his phone in his left hand and looks down at it as he crosses the street.

{¶ 47} Hawkins testified that he believed that Belmon was carrying the murder weapon wrapped up in the sweatshirt.

{¶ 48} Sergeant Brian Smith of the Toledo Police Department testified that he was involved in a consent search of apartment FF2 just a few days after the shooting.

20.

Specifically, they were looking for clothing that could have belonged to the shooter. Smith testified, without objection, that "In regards to the clothing, [B.B.] had told my detectives that the shooter had been – not only had been in her apartment, but had changed clothes before he left." Specifically, "she had told us that she was certain that there was a pair of white socks that were in the garbage. I believe she said in the kitchen, but in the apartment." When showing the photo of the sock to the jury, Smith testified, "The sock matters because specifically I was informed through my detectives that [B.B.] had said that the shooter changed clothes." This time, defense counsel objected to the double hearsay, and the trial court sustained the objection. In addition to the sock, Smith also collected a black jacket and a black pair of jeans.

{¶ 49} Hawkins also testified regarding the search for clothing. He stated that it was conducted because B.B. "informed me that Flex, the person she knew as Flex, had done the shooting." Defense counsel raised a hearsay objection to this testimony, which the trial court sustained.

{¶ 50} Sarah Horst, a forensic scientist in the forensic biology and DNA unit at the Ohio Bureau of Criminal Investigations ("BCI"), identified that Belmon was a major contributor of DNA on the black jacket and jeans. She did not find any usable DNA on the socks.

{¶ 51} On July 30 and 31, 2022, the days after the shooting, Hawkins returned to the scene and recovered four shell casings from the corner of building GG, near Byrne Road. Two were 9mm shell casings and they looked "fresh," "pretty new-like."

Approximately one or two feet away from the 9mm shell casings were two .380 casings. The .380 casings were corroded and half buried in dirt. Hawkins surmised that the fact that the two pairs of casings were found close together suggested that "there was a good chance that someone, whoever had done the shooting the night before, had probably been out there at some other point and done something similar at some time."

{¶ 52} Regarding the .380 casings, the State called Detective Jeff Quigley of the Toledo Police Department, who testified that on June 7, 2022, he observed a shootout on Central Avenue near Parkwood between Belmon and three other individuals. Defense counsel did not object to the testimony generally, but only to two specific instances of potential hearsay. Belmon and one of the individuals were standing on the corner, wearing balaclava masks, while the other two individuals were standing in front of a house. When the police responded to the shootout, the two individuals on the corner fled. The police apprehended one of them, who reported that the other individual was Belmon. A balaclava mask was found that contained Belmon's DNA.

{¶ 53} Detective Robert Bascone of the Toledo Police Department testified that he helped execute a felony search warrant for Belmon three days later on June 10, 2022, at a location on Cottage Avenue where Belmon was residing. Belmon, who was 17 years old at the time, lived there with other people. Inside of the home, on the living room floor, was a .380 caliber Taurus pistol with the serial number 59598D. In addition, Bascone found a 9mm Strum Ruger pistol behind the front door of the residence. Belmon's DNA

22.

was present on the 9mm Ruger. No evidence was presented that his DNA was present on the .380 Taurus.

{¶ 54} Kaitlyn Vorst, a senior criminalist with the Toledo Police Forensic Lab, testified as an expert witness that the two .380 shell casings that were collected on July 30, 2022, were fired from the Tarus pistol with serial number 59598D.

{¶ 55} Finally, the State played Hawkins's interview with Belmon. In the interview, Belmon stated that on the night of the shooting he was hanging out with M.G. at apartment FF2. He arrived around 4:00 p.m. and they spent their time smoking. Belmon was wearing black jogging pants and a red hoodie. B.B. was not home at the time. Belmon stated that around the time of the shooting he heard a big boom and then a little boom. It sounded to him like two different guns. His friend told him to turn off the lights and Belmon did that and got on the floor. As soon as he heard the police, they headed outside to see what was going on, but the police could not tell them anything. Belmon reported that someone who was standing outside said that he saw a person run by his window near the time of the shooting. He and M.G. talked for a little bit then realized they were locked out of the apartment and asked a security officer to let them back inside. Belmon then called a friend, who he referred to as his "sister," on his wi-fi phone trying to get a ride out of the apartment complex. His friend called for a Lyft ride and he had to walk down the street to meet it because the police had Byrne Road blocked.

{¶ 56} Later in the interview, Belmon admitted that he used to go by "Flex." He also said that he likes taking risks and feeling like he is untouchable and can do whatever

23.

he wants.  In addition, he said he "loves guns."  He, however, denied shooting any guns on the night of the incident and claimed that he did not even have a gun at that time.

## Other-Acts Evidence

{¶ 57} In his first assignment of error, Belmon argues that the trial court erred when it permitted the State to introduce evidence of Belmon's prior bad acts.

{¶ 58} At the outset, Belmon concedes that although defense counsel filed a motion in limine to exclude the State's use of prior bad acts evidence, he did not object to the evidence at trial, and he therefore has waived all but plain error on appeal.  *See State v. McKnight*, 2005-Ohio-6046, ¶ 97 ("The defense filed a motion in limine to exclude victim-impact evidence.  Nevertheless, except where noted, the defense did not renew its objection to the foregoing testimony at trial and thus waived all but plain error."); *State v. Hunter*, 2006-Ohio-5113, ¶ 28 (6th Dist.).  "Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice."  *State v. Gregg*, 2024-Ohio-5974, ¶ 14 (6th Dist.), quoting *State v. Bailey*, 2022-Ohio-4407, ¶ 8.  To demonstrate plain error, Belmon "must establish that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial." (Internal quotations omitted.)  *Id.*, quoting *Bailey* at ¶ 8.

{¶ 59} "A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to

24.

commit crime." *State v. Hartman*, 2020-Ohio-4440, ¶ 20, quoting *State v. Curry*, 43

Ohio St.2d 66, 68 (1975). This principle is embodied in Evid.R. 404(B), which provides

that "[e]vidence of any other crime, wrong or act is not admissible to prove a person's

character in order to show that on a particular occasion the person acted in accordance

with the character." *Id.* at ¶ 21. Evid.R. 404(B) does, however, allow evidence of

another crime, wrong, or act to be admitted for another purpose, such as proving "motive,

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of

accident." *Id.* at ¶ 22; *see also* R.C. 2945.59. "The key is that the evidence must prove

something other than the defendant's disposition to commit certain acts." *Id.*

{¶ 60} The first step in an other-acts analysis is examining whether the evidence is

relevant, not to the ultimate determination of guilt, but "*to the particular purpose* for

which it is offered" and for an issue "that is actually in dispute between the parties."

(Emphasis sic.) *Id.* at ¶ 26-27. "To properly apply the rule . . . courts must scrutinize the

proponent's logic to determine exactly how the evidence connects to a proper purpose

without relying on any intermediate improper-character inferences." *Id.* at ¶ 23, citing

*United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014). In addition, to be relevant

"there must be some threshold showing that the act for which the evidence is offered

occurred." *Id.* at ¶ 28; *Toledo v. Bryant-Bey*, 2023-Ohio-4798, ¶ 16 (6th Dist.). "Similar

act evidence is relevant only if the jury can reasonably conclude that the act occurred and

that the defendant was the actor." *Id.*, quoting *Huddleston v. United States*, 485 U.S. 681,

25.

689 (1988). Whether other-acts evidence is admissible under Evid.R. 404(B) is a question of law that is reviewed de novo. *Id.* at ¶ 22

{¶ 61} If evidence is admissible for a non-propensity purpose under Evid.R. 404(B), the trial court must next determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice as set forth in Evid.R. 403(A). *Id.* at ¶ 29. "Weighing the probative value of the evidence against its prejudicial effect is a highly fact-specific and context-driven analysis" that "necessarily involves an exercise of judgment." *Id.* at ¶ 30. Thus, whether the evidence is admissible under Evid.R. 403(A) is reviewed for an abuse of discretion. *Id.*

{¶ 62} Belmon argues that it was plain error for the trial court to allow the State to introduce evidence of his possession and use of a .380 Taurus pistol in an unrelated incident at a different location in order to prove his identity as the shooter in this case. The State contends, on the other hand, that Belmon's connection to the .380 Taurus pistol shows that at some point he was present at the same location where the murder weapon was fired on July 29, 2022, which therefore proves his identity.

{¶ 63} As an initial matter, it is important to specify what evidence is being discussed. In this case, the other-acts evidence consists of (1) Detective Quigley's testimony that he witnessed a shootout involving Belmon on June 7, 2022, (2) DNA Analyst Smith's testimony that a balaclava mask recovered from the shootout contained Belmon's DNA, and (3) Detective Bascone's testimony that he executed an arrest warrant on June 10, 2022, during which he discovered the .380 Taurus pistol.

26.

{¶ 64} Regarding Quigley's and Smith's testimony, the trial court committed plain error when it allowed them to testify regarding the shootout and the DNA match from the balaclava mask because there is not a sufficient threshold connection between the events of June 7, 2022, and the crime Belmon allegedly committed on July 29, 2022. The connection that the State attempts to draw is that .380 shell casings were discovered at the June 7, 2022 shooting, Belmon was present at the June 7, 2022 shooting and was the person using the .380 Taurus, older .380 shell casings were discovered at the location of the July 29, 2022 murder, and the shell casings from both the June 10, 2022 shooting and the July 29, 2022 murder site were fired from the same .380 Taurus that was recovered when officers executed the arrest warrant. This, however, does not conform to the evidence presented.

{¶ 65} Contrary to the State's assertion, Quigley did not testify that .380 shell casings were found at the scene of the June 7, 2022 shooting. He simply stated, "there was a few shell casings on the corner of Parkwood and Central, indicating that at least one of the males on that corner had fired," and "there were shell casings found on the corner of Parkwood and Central." Moreover, contrary to the State's assertion, no evidence exists that shell casings from the June 7, 2022 shootout were compared or linked to the .380 Taurus. In fact, Vorst only compared the casings found at the July 29, 2022 scene to some that were test-fired from the .380 Taurus.

{¶ 66} For these reasons, this case differs significantly from *State v. Gilmer*, 2024-Ohio-1178 (6th Dist.), upon which the State relies. In *Gilmer*, one of the issues on appeal

27.

concerned the joinder of two separate shootings for trial. Relevant to that analysis was whether evidence from the first shooting would have been admissible Evid.R. 404(B)(2) "other acts" evidence in a trial for the second shooting. *Gilmer* at ¶ 52. In that case, the evidence established that shell casings from both scenes were fired from the same gun and Gilmer was identified as the perpetrator of the first shooting. *Id.* at ¶ 60, 62. This court held that the evidence of the first shooting would have been admissible under Evid.R. 404(B)(2) in a trial for the second shooting, reasoning:

> Here, K.B. identified Gilmer as the shooter in the June 2021 incident. The casings found at the scene of that incident were found to have been fired from the same firearm as the casings and bullets recovered from the November 2021 crime scene. The evidence from the first incident was offered for the purpose of proving Gilmer's identity as the shooter in the second incident, and its probative value was not outweighed by the danger of unfair prejudice.

*Id.* at ¶ 62.

{¶ 67} Like *Gilmer*, the State's purpose of introducing testimony regarding the June 7, 2022 shootout was to tie Belmon to the .380 Taurus. But, without matching shell casings, the only evidence that Belmon used the .380 Taurus was the fact that the gun was found in the living room of the residence where he was arrested. It is worth noting, moreover, that no evidence was presented that Belmon's DNA was on the .380 Taurus, yet evidence was presented that his DNA was on the 9mm Ruger that was found behind the front door. The mere presence of the .380 Taurus in the residence where he was arrested three days later does not provide a threshold showing that Belmon used the .380 Taurus at the June 7, 2022 shootout. Therefore, unlike *Gilmer*, because the jury could

28.

not reasonably conclude that Belmon used the .380 Taurus, no valid Evid.R. 404(B) purpose exists for the testimony regarding the June 7, 2022 shootout, and the only remaining import of that testimony was to demonstrate that Belmon had a propensity to be involved in violent gun crimes.

{¶ 68} Furthermore, a reasonable probability exists that this error affected the outcome of the trial. Evidence that Belmon has a propensity to be involved in violent gun crimes is highly prejudicial where he is on trial for similar conduct. Compounding that prejudice is the fact that there is not overwhelming evidence of Belmon's guilt; there is no eyewitness evidence, no video evidence showing the crime, no forensics tying him to the murder weapon, no motive, and no confession. Instead, the State's case against Belmon largely rested on a loose connection between Belmon and shell casings discovered at the scene—which were fired from a different weapon at an indeterminate time prior to the murder—and on hearsay statements by third parties who did not testify at trial. The absence of any direct evidence tying Belmon to the murder increases the probability that the jury simply and impermissibly relied on his propensity to be involved in violent gun crime to find him guilty.

{¶ 69} Finally, the trial court's error in admitting this testimony was obvious, particularly when compared with Bascone's testimony regarding the execution of the arrest warrant. Again, the State's purpose in admitting the evidence was to tie Belmon to the .380 Taurus. Unlike Quigley's testimony, Bascone's testimony provides a direct connection between Belmon and the .380 Taurus. Notably, a fair argument could be

29.

made that even Bascone's testimony was insufficient to satisfy the threshold requirement that Belmon was connected to the .380 Taurus in that the evidence only showed that it was present in the same residence where he was arrested but there were other people also living there and his DNA was found on a different gun, not the .380 Taurus. This is a close question, however, and is not as obvious an error as admitting evidence tying Belmon to a completely unrelated shooting incident.

{¶ 70} Similarly, whether the probative value of Bascone's testimony was substantially outweighed by the risk of unfair prejudice as described in Evid.R. 403(A) is also a close question.

{¶ 71} On the one hand, Bascone's testimony is not overly probative on the issue of identifying Belmon as the shooter on July 29, 2022. Indeed, the evidence shows that Belmon is only loosely associated with the .380 Taurus; there is no direct evidence showing that he ever handled or fired the gun. Further, the .380 Taurus is only loosely associated with the July 29, 2022 murder; although its shell casings were found near the area where the 9mm casings from the murder weapon were found, the casings were from an indeterminate time before the July 29, 2022 shooting, there is no evidence how they came to be in that location, and there is no evidence that the .380 Taurus was similarly used to shoot indiscriminately down Byrne Road.

{¶ 72} On the other hand, Bascone's testimony is not significantly prejudicial. Unlike Quigley's testimony, Bascone does not go into detail about Belmon's conduct. Instead, he simply states that he was there to execute a felony warrant.

30.

{¶ 73} In light of the weak connection to identity and the relatively benign description of Belmon's "other acts," reasonable minds could disagree on whether the probative value of Bascone's testimony was substantially outweighed by the prejudicial effect. This type of close question does not result in the obvious error that the plain error doctrine was designed to protect against.

{¶ 74} In sum, I believe the trial court committed plain error when it permitted the State to introduce the testimony of Quigley and Smith relative to Belmon's involvement in a shootout on June 10, 2022, because there was no evidence linking that shootout to the .380 Taurus that was later recovered. In contrast, I believe the trial court did not commit plain error when it allowed Bascone's testimony detailing that the .380 Taurus was seized from the residence during Belmon's arrest because that evidence provided a direct, albeit tenuous, link between Belmon, the .380 Taurus, and the July 29, 2022 murder.

{¶ 75} Accordingly, I would hold that Belmon's first assignment of error is well-taken and reverse his conviction on that basis.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.