[Cite as *State v. Harris*, 2025-Ohio-5438.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO.   C-240539 |
| | | TRIAL NO.   B-2300376 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| CHRISTOPHER HARRIS, | : | |
| | | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed 50% to defendant-appellant, Christopher Harris, and 50% to appellee, the State of Ohio.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 12/5/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

**[Cite as *State v. Harris*, 2025-Ohio-5438.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-240539 |
| | | TRIAL NO. | B-2300376 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| | | *O P I N I O N* | |
| CHRISTOPHER HARRIS, | : | | |
| Defendant-Appellant. | : | | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: December 5, 2025


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters* and *Margaret Kane*, Assistant Public Defenders, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} Defendant-appellant Christopher Harris appeals his convictions for felony offenses arising from a shooting that took place at the start of January 2023.

{¶2} Raising nine assignments of error, Harris argues that the trial court erred in rejecting his claim of self-defense and convicting him of aggravated murder and having weapons while under disability. He further argues that his conviction for aggravated murder was contrary to the weight and sufficiency of the evidence on the element of prior calculation and design. Harris also raises two arguments concerning the jury. First, he contends that the trial court erred in the jury selection process by precluding defense counsel from asking questions about implicit racial bias during voir dire and by overruling his request to strike a juror for good cause. Second, he contends that the trial court's instruction regarding the use of lethal force to defend property impermissibly confused the jury.

{¶3} Harris also asserts that the prosecutor engaged in misconduct during closing arguments by misstating the law, referencing facts not in evidence, and making unfair inferences. Next, Harris challenges the trial court's denial of his motions for a mistrial and a new trial due to the judge's alleged bias against defense counsel. Viewing the alleged errors in toto, Harris additionally argues that the combined effect deprived him of a fair trial. He further attacks his conviction for having weapons while under disability, advancing a claim that the charge should have been dismissed because the statute is unconstitutional. Finally, Harris contends that the trial court erred in sentencing him.

{¶4} After thoroughly reviewing the record and the relevant law, we reject Harris's challenges against his convictions and uphold them. Finding two of the sentencing errors meritorious, however, we reverse his sentences in part and remand

for resentencing.

### *Factual and Procedural History*

**{¶5}** The charges against Harris arose from a shooting that took place after the turn of the new year on January 1, 2023. Harris testified at trial. According to Harris, he and his then-girlfriend celebrated the festivities at a nightclub in Newport, Kentucky.[1] They returned home to their apartment on Purcell Avenue in East Price Hill around 2:30 a.m. The neighborhood was a mix of single-family and multifamily homes. Harris had lived on the street for about two and a half years, and he and his neighbors looked out for one another.

**{¶6}** According to Harris, he grew suspicious when he saw a man he did not know—later identified as C.W.—leaning into a white Cadillac he did not recognize and "fidgeting and messing with stuff" inside the vehicle. C.W.'s Cadillac was parked on the street a couple houses down from Harris's apartment. Harris testified that he wondered what the man was doing outside at 2:30 a.m. There had been several car break-ins in the area and gunshots were common in the neighborhood. Witnesses at trial testified that C.W. was a longtime resident of the street, and the Cadillac was a recent purchase.

**{¶7}** According to Harris, his girlfriend got out of the car and entered the house while he lingered at his vehicle, suspicious of the unknown man. As surveillance video from the scene demonstrated, Harris pointed at the man three times—whether he simply pointed his finger or a black firearm was a matter of dispute at trial.

**{¶8}** Harris testified that he called out to the man and asked, "What you

---

[1] Harris testified that he and his girlfriend got married a few months prior to trial. Because they were not yet married at the time these events transpired, we refer to her as his "girlfriend" throughout the opinion.

doing? What are you doing over here?" Per Harris, the man told him he "need[ed] to mind [his] F-ing business" and he "[did]n't know who [he was] talking to." Harris testified that he walked up to his apartment building but lingered outside the front door, continuing to watch and verbally engage the man. About 30 seconds later, he left the threshold of the building and went to investigate, holding his girlfriend's pistol at his side for protection. Harris explained that his girlfriend had left the firearm in the vehicle, and he retrieved it from the center console to bring it inside the apartment.

{¶9} Harris approached the man at a relatively fast clip. He testified that he saw the man wipe down the door handle of the Cadillac. According to Harris, he did not believe that the man was washing his car at that odd hour; rather, he wondered if the man was trying to remove fingerprints from the vehicle. Harris testified that he walked down and told the man his girlfriend would call the police if the man did not explain what he was doing, at which point the man pointed a firearm at him. Harris raised his girlfriend's pistol in response. As the video capturing the incident showed, both men fired multiple rounds, emptying their respective firearms. Witness testimony further revealed that both men sustained serious gunshot wounds. The deadly confrontation spanned a matter of seconds.

{¶10} C.W.'s girlfriend testified that she was inside getting ready for their night out after work when the events transpired. Per her testimony, C.W. ran into their apartment across the street following the shooting and told her that he had been shot. Despite lifesaving efforts by his girlfriend and first responders, C.W. succumbed to his injuries at the scene. Harris testified to his own injuries. He explained that his girlfriend transported him to the hospital immediately after the shooting. Harris underwent multiple emergency surgeries and, following a two-month stay in the hospital and additional surgeries, ultimately survived.

5

{¶11} Video footage from a neighbor's outdoor camera captured the shooting. The video contained no audio, meaning the alleged verbal exchange between the men was not captured. But the video, played slowly, appears to show that C.W. fired the first shot by fractions of a second. The State argued at trial that the video showed Harris repeatedly stagger when he got out of his car, suggesting he had consumed more than the one drink he admitted. Evidence garnered in connection with the investigation showed that C.W. tested positive for marijuana metabolites and a "therapeutic amount" of methamphetamine, and his blood alcohol level was over twice the legal limit.

{¶12} On January 25, 2023, a grand jury indicted Harris on counts of aggravated murder, felony murder, and having weapons while under disability, including gun specifications on the homicide charges. Harris unsuccessfully moved to dismiss the weapons-under-disability count on constitutional grounds. The aggravated murder and felony murder counts were tried to a jury, and the firearm specifications accompanying those counts and the weapons-under-disability count were tried to the bench.

{¶13} Harris was found guilty on all counts and specifications. After merging the felony murder count and several of the firearm specifications, the trial court imposed an aggregate sentence of 90 months consecutive to life imprisonment with parole eligibility after 20 years. In addition, the court ordered restitution in the amount of $7,523.60 and ordered the firearm used by Harris to be forfeited. Harris timely appealed.

*Analysis*

{¶14} Harris raises nine assignments of error. We address each in turn.

### A. Self-Defense

**{¶15}** In his first assignment of error, Harris maintains that the trial court erred in rejecting his claim that he acted in self-defense.

**{¶16}** The offense of aggravated murder is proscribed by R.C. 2903.01(A), which provides in pertinent part that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" Harris concedes that he caused the death of C.W., but argues that the weight of the evidence supported that he acted in self-defense.

### 1. Standard of Review

**{¶17}** In assessing self-defense claims, reviewing courts conduct a manifest weight analysis to determine whether the State met its burden of persuasion. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. Distinct from sufficiency review, a manifest weight inquiry requires us to assess whether the trier of fact created a manifest miscarriage of justice in resolving conflicts in the evidence. *State v. Yeban*, 2024-Ohio-2545, ¶ 57 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997).

**{¶18}** We afford substantial deference to the credibility determinations of the trier of fact because the trier directly observes the witnesses during the proceedings. *See State v. Glover*, 2019-Ohio-5211, ¶ 30 (1st Dist.), quoting *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20. Accordingly, reversal on manifest weight grounds is warranted "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

### 2. The Law on Self-Defense in a Deadly Force Case

**{¶19}** The elements of a self-defense claim in a deadly force case are (1) the defendant was not at fault in creating the situation giving rise to the affray, (2) the defendant had a bona fide belief that he was in imminent danger of death or great

7

bodily harm and his only means of escape was in the use of similar force, and (3) the defendant did not violate any duty to retreat. *Messenger* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

{¶20} Under Ohio's current burden-shifting scheme, the defendant must first produce evidence that tends to support that he acted in self-defense. R.C. 2901.05(B)(1). Once the defendant satisfies this initial burden, the burden shifts to the State to disprove at least one of the elements of self-defense beyond a reasonable doubt. *Id.*; *see State v. Smith*, 2020-Ohio-4976, ¶ 49 (1st Dist.). Here, the trial court provided the jury with a self-defense instruction, meaning the court concluded that Harris presented adequate evidence to carry his initial burden of production. *See State v. Mitchell*, 2023-Ohio-2604, ¶ 12 (1st Dist.), citing *Messenger*, 2022-Ohio-4562, at ¶ 26. We therefore scrutinize whether the weight of the evidence supports that the State met its reciprocal burden to disprove at least one of the elements beyond a reasonable doubt.

### 3. Analysis of the Elements of Harris's Self-Defense Claim

#### a. Duty to retreat

{¶21} As stated, the third element of a successful self-defense claim involving deadly force mandates that the defendant did not violate any duty to retreat or otherwise avoid the danger. *See Messenger* at ¶ 14. Ohio's recent "stand your ground" law dispenses with this requirement where the defendant was in a place he lawfully had a right to be. *See Mitchell* at ¶ 17, citing R.C. 2901.09(B). Because Harris lawfully had a right to be on his street, he had no duty to retreat under Ohio law.

#### b. Not at fault

{¶22} The first element of a meritorious self-defense claim requires that the defendant was not at fault in creating the situation giving rise to the affray. *See*

8

*Messenger*, 2022-Ohio-4562, at ¶ 14. "The 'not at fault' requirement [ ] means that the defendant must not have been the first aggressor in the incident." *State v. Turner*, 2007-Ohio-1346, ¶ 24 (2d Dist.), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979).

**{¶23}** At trial, the State argued that Harris was the first aggressor because he left the threshold of his house and approached C.W. with a pistol in hand. In response, Harris cites case law from this court holding that an individual claiming self-defense need not refrain from all engagement with the other party to avoid being deemed the initial aggressor. *See State v. Nichols*, 2025-Ohio-1515, ¶ 25 (1st Dist.), quoting *State v. Elam*, 2022-Ohio-1895, ¶ 14 (12th Dist.). While that may be true, "'a defendant voluntarily participating in or initiating a confrontation, especially for purposes other than protection, cannot justify or excuse' [his] use of force." *State v. Rose*, 2024-Ohio-5689, ¶ 28 (1st Dist.), quoting *State v. Smith*, 2021-Ohio-1185, ¶ 23 (8th Dist.). Harris testified at trial that his purpose in confronting C.W. was to protect the neighborhood. But C.W. posed no immediate threat to life or limb while he was "fidgeting and messing with" the Cadillac.

**{¶24}** Even if C.W. did rudely respond to Harris, Harris escalated the situation by choosing to physically confront C.W. while brandishing a loaded pistol. In other words, Harris reentered the situation with C.W. after initially retreating to his home. Courts have generally held that "a defendant, having willingly advanced toward a volatile situation[,] cannot rely on the affirmative defense of self-defense." *State v. Walker*, 2021-Ohio-2037, ¶ 19 (8th Dist.). *Accord Nichols* at ¶ 26 (reasoning, "[d]efendants are 'at fault' in causing the altercation if they knowingly and voluntarily enter a place or situation where a victim is located"); *State v. Warth*, 2023-Ohio-3641, ¶ 38 (1st Dist.) ("the law continues to prohibit a person from provoking an assault or voluntarily entering an encounter and then claiming a right of self-defense"); *Mitchell*,

2023-Ohio-2604 (1st Dist.) (reversing a murder conviction where defendant approached first but the decedent "escalated the situation from a verbal confrontation into a physical confrontation" by brandishing a knife and thrusting it at the defendant before the defendant shot him); *Elam* at ¶ 14 ( "[a] person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense"); *State v. Sekic*, 2011-Ohio-3978, ¶ 15 (8th Dist.) (holding that defendant could not claim self-defense where he "willingly advanced toward a volatile situation").

{¶25} As the trier of fact, the jury was tasked with assessing the credibility of the witnesses and was free to accept or reject any portion of the evidence or the narrative offered by Harris. *See State v. Gasper*, 2023-Ohio-1500, ¶ 75 (1st Dist.). Even if the jury accepted Harris's explanation for how the shootout unfolded, he would not be absolved of criminal liability in light of the fact that he willingly advanced towards a perceived danger with a loaded firearm in hand. The surveillance video supports this conclusion. It reveals a black object against Harris's white sweatshirt, consistent with a firearm, as he lowers his extended arm. This evidence supports the conclusion that Harris acted first by pointing a firearm at C.W. multiple times. On this record, and given this evidence, the State met its burden to disprove by the weight of the evidence the assertion that Harris was not at fault in creating the situation giving rise to the affray.

{¶26} Thus, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, we conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice in rejecting Harris's self-defense claim. Accordingly, Harris's first assignment of error is overruled.

### B. *Sufficiency and Manifest Weight of the Evidence*

{¶27} In his second assignment of error, Harris challenges the sufficiency and

manifest weight of the evidence supporting his conviction for aggravated murder. Specifically, Harris maintains there was a dearth of evidence establishing that he acted with prior calculation and design.

{¶28} To assess whether a conviction is supported by sufficient evidence, we ask "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶29} By contrast, a manifest-weight challenge requires us to independently "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.), citing *Thompkins*, 78 Ohio St.3d at 388. Again, reversal and retrial are warranted only in "exceptional cases in which the evidence weighs heavily against the conviction." *State v. Sipple*, 2021-Ohio-1319, ¶ 7 (1st Dist.), quoting *Martin*, 20 Ohio App.3d at 175.

{¶30} Prior calculation and design is an essential element of the offense of aggravated murder under R.C. 2903.01(A). As the Ohio Supreme Court observed, "[t]he term 'prior calculation and design' is not defined by statute[.]" *State v. Walker*, 2016-Ohio-8295, ¶ 38. Rather,

> [t]he apparent intention of the General Assembly in employing this phrase was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill. Thus, instantaneous deliberation is not sufficient to constitute "prior calculation and design."

11

*Id.*, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978). Put another way, "[e]vidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *Id.* at ¶ 18. The presence or absence of prior calculation and design is necessarily a fact-intensive inquiry. *Id.* at ¶ 39, quoting *State v. Maxwell*, 2014-Ohio-1019, ¶ 148.

**{¶31}** To aid this inquiry, courts consider three factors: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events'?" *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976). These factors are not exclusive. *State v. Jones*, 2021-Ohio-3311, ¶ 17.

**{¶32}** Literally applying the factors here is not particularly helpful to the question of whether Harris acted with prior calculation and design. There was testimony that Harris and C.W. were strangers to one another, it does not appear that Harris chose the weapon or the site in advance, and the events unfolded quickly. *See Taylor* at 19. But the factors are not dispositive, and another critical factor tilts the scales toward a finding of prior calculation and design in this case.

**{¶33}** Harris testified that he pointed at C.W. three times shortly after getting out of his car. He even demonstrated this for the jury: "for the record, he has lifted his right arm perpendicular to the ground with four fingers pointed forward." But the surveillance video reveals that Harris did not point his fingers; he pointed a gun. Thereafter, Harris walked up a slight hill to his home, waited for about 30 seconds, and returned to confront C.W.

**{¶34}** These developments are crucial in the analysis of prior calculation and design. They support the State's theory that Harris decided to use deadly force against C.W. from the moment he got out of the car and pointed his loaded weapon at C.W. *See State v. Fears*, 86 Ohio St.3d 329, 341 (1999) (though events unfolded quickly, the record showed that defendant reflected on his actions immediately prior to the shooting, deliberated, and chose to shoot the victim). The evidence suggested that Harris acted with advance reasoning to harm C.W., because he retreated and then returned. *See State v. Nicholson*, 2024-Ohio-604, ¶ 60-61; *Walker*, 2016-Ohio-8295, at ¶ 17-18. This was more than momentary deliberation. *See Walker* at ¶ 17.

**{¶35}** Because the record contains sufficient evidence of prior calculation and design, the jury did not lose its way in rendering a guilty verdict on the aggravated murder count. Harris's second assignment of error is overruled.

### C. Voir Dire

**{¶36}** In his third assignment of error, Harris maintains that his rights to due process and an impartial jury were violated at trial. More specifically, he challenges the trial court's ruling preventing defense counsel from asking jurors questions about implicit racial bias during voir dire. Harris also contends the trial court erred in denying counsel's request to strike Prospective Juror Number 6 for good cause.

**{¶37}** The right to a fair and impartial jury is protected by the Sixth Amendment to the United States Constitution as well as Article I, Sections 5 and 10 of the Ohio Constitution. *State v. Jackson*, 2005-Ohio-5981, ¶ 56, quoting *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). To this end, voir dire serves to reveal whether a prospective juror fulfills the statutory qualifications of a juror and whether the juror is free from bias or prejudice against either party. *Krupp v. Poor*, 24 Ohio St.2d 123, 125 (1970), quoting *Pavilonis v. Valentine*, 120 Ohio St. 154 (1929), paragraph one of the

syllabus.

**{¶38}** The scope and extent of voir dire in criminal cases are matters that generally fall within the discretion of the trial court. *State v. Ford*, 2019-Ohio-4539, ¶ 144, citing *State v. LaMar*, 2002-Ohio-2128, ¶ 40. Accordingly, we review proposed errors concerning voir dire for an abuse of discretion. *State v. Were*, 2008-Ohio-2762, ¶ 78, quoting *State v. Lorraine*, 66 Ohio St.3d 414, 418 (1993). An abuse of discretion connotes action that is arbitrary, unreasonable, or unconscionable. *LaMar* at ¶ 40, citing *State v. Adams*, 62 Ohio St.2d 151 (1980). "Absent a clear abuse of discretion, prejudicial error cannot be assigned to the examination of the venire." *Jackson* at ¶ 28.

**{¶39}** Marrying these concepts, the trial court's discretion to restrict voir dire must be tempered by the essential demands of fairness. *Jackson* at ¶ 56. Accordingly, "any limits upon voir dire must be reasonable." *Id.* at ¶ 48.

### 1. *Preclusion of defense counsel's questions about implicit racial bias*

**{¶40}** Both Harris and C.W. are black, and the topics of both implicit and explicit racial bias were explored by the State and the defense in jury selection. In the context of possible explicit racial bias, Prospective Juror Number 13 specified that she was robbed at gunpoint by a black man at the age of 15, and the experience traumatized her. Similarly, Prospective Juror Number 9 disclosed that she had been involved in a racially-related attack and defended herself against two girls who did not like her. In highlighting these disclosures, we do not mean to suggest that either juror held explicit racial prejudices. But they explicitly mentioned race as a part of previous negative experiences in response to questions from the State.

Defense counsel asked the prospective jurors about racial bias that might be

implicit or subconscious. In this context, defense counsel conducted a demonstration using a visual aid apparently consisting of triangles. The visual aid is not in the record, but from the questions he asked the jury, it appears that the diagram tested the jurors' likelihood to fill in visual gaps by resorting to subconscious thought patterns. He explained, "I'm just using that as an example [regarding] what happens about jumping ahead without taking a moment and the implicit bias that I think you're all talking about, which I think is self-taught." This demonstration and defense counsel's questioning about triangles went on for several pages of transcript in our record. The State did not object to the demonstration, and defense counsel was permitted to engage the jury in questions about implicit bias using the visual aid.

**{¶41}** After defense counsel completed the triangle exercise, he then asked the jury questions about race:

> [DEFENSE COUNSEL]: I think it's fair to talk about race. Have any of you ever found yourselves in a place where tensions based on race or even gender or national origin were raised because of that issue? . . . Had anybody here -- I mean, I think one juror mentioned it, mentioned a time where she was robbed -- she said -- by a black person. Has anybody had an unfortunate or unacceptable or difficult situation with someone who was black?
>
> PROSPECTIVE JUROR NUMBER 7: (Raising hand.)
>
> [DEFENSE COUNSEL]: Yes, ma'am.
>
> PROSPECTIVE JUROR NUMBER 7: I've worked at restaurants with all types. Between the people behind the lines and between the people in front of the lines, and they don't get their way, you get thrown under the bus a few times and you are like, okay, just disregard this. It's

15

not worth it. It can get scary.

[DEFENSE COUNSEL]: I'd like to share something more with you, if I could.

[ASSISTANT PROSECUTOR]: Excuse me, Judge, I'm just going to renew my objection.

THE COURT: You know what, I am going to sustain the objection. We're not here to give a lecture about race.

[DEFENSE COUNSEL]: I am here at the lectern. You're talking about --

THE COURT: You are supposed to be questioning the jurors to see if they are going to be fair and impartial. It's not a lecture about race, so please ask your next question.

[DEFENSE COUNSEL]: I'm just trying to prompt responses based on the question of race --

THE COURT: And I'm asking you to do what you are supposed to do to ask questions of the jurors to see if they are qualified to sit on this particular case.

[DEFENSE COUNSEL]: We'll move on from the issue of race. I'm sorry if the issue was an objection.

[ASSISTANT PROSECUTOR]: Judge, I am going to object to that.

[DEFENSE COUNSEL]: I want to ask you --

THE COURT: You know what, the jury hears what [defense counsel is] doing. Ladies and Gentlemen, we're supposed to be in a situation where you are asked questions to determine whether or not

you are fair and impartial jurors. You are not supposed to be subject to lectures about anything. Okay. I know there's a situation where attorneys ask certain questions, but I think we've gone far enough. That's my ruling from the Court. I'm trying to be fair also. If you disagree with that, that's fine. I understand that. I'm trying to do my job. I'm trying to get the attorneys to do their job. That's where we are. Next question, please.

At that point, defense counsel moved on and began asking another juror about his work experience.

**{¶42}** Harris argues that the trial court's ruling deprived him of the opportunity to pose questions to unearth racial bias and broadcasted to the prospective jurors that they need not examine any implicit racial biases they may hold. There are a number of problems with Harris's position.

**{¶43}** First, while we might agree that the answers given by Prospective Jurors 7, 9, and 13 warranted further questioning as to whether these jurors harbored any *explicit* racial bias that would have impacted their ability to serve on the jury, that is not what defense counsel asked. In fact, he asked no question at all. Instead, the remark that drew the State's objection was a statement: "I'd like to share something more with you if I could." This followed on the heels of defense counsel's demonstration of implicit bias, about which the identified jurors had made no concerning disclosures. We therefore have no indication that Harris's attorney was prohibited from asking the prospective jurors about explicit racial bias that would have impacted their fairness. He never attempted to do so.

**{¶44}** Second, we do not read the trial court's limitation as precluding those questions had defense counsel asked them. Rather, the trial court's instruction merely

prohibited defense counsel from giving a "lecture" on race. This direction precluded defense counsel from providing information to the jury. It did not prohibit the jury from sharing information with defense counsel when prompted.

**{¶45}** Lastly, and perhaps most concerning, defense counsel acquiesced in the limitation rather than attempting to ask questions about explicit racial bias. After the judge instructed Harris's attorney not to provide a lecture about race, defense counsel said, "We'll move on from the issue of race." The trial court had not precluded defense counsel from the topic of race entirely, but had merely instructed counsel not to "lecture" the jury. Defense counsel abandoned the issue by agreeing to forego further questions on the subject.

**{¶46}** This is what separates Harris's case from others in which race was entirely precluded as a subject of voir dire. For example, in *State v. Lattimore*, 2002 Ohio App. LEXIS 731, *9 (1st Dist. Feb. 22, 2002), we observed that a trial court abuses its discretion when "a total preclusion or foreclosure of good faith voir dire examination as to biases is imposed." And in *State v. Jones*, 20 Ohio App.3d 331, 332 (1st Dist. 1984), we instructed that "the court may not totally preclude or foreclose any and all questioning on the subject [of racial bias.]"

**{¶47}** The scope of the trial court's limitation also distinguishes this case from *State v. Belmon*, 2025-Ohio-4400 (6th Dist.). There, the Sixth District reversed Belmon's convictions for murder and related felonies because the trial court entirely foreclosed defense counsel from inquiring into potential racial biases that prospective jurors disclosed during jury selection. *Id.* at ¶ 27-28. The first question the trial court permitted was whether the prospective jurors had any issue listening to him, an African-American attorney. *Id.* at ¶ 7. None did. *Id.* Counsel then invited prospective jurors to share experiences in which they experienced stereotypes based on race,

18

gender, or religion. *Id.* at ¶ 8. One white juror shared an experience that he characterized as "reverse discrimination" based on his race. *Id.* The juror later expressed disdain for gun violence and indicated he could not be fair and impartial in the case. *Id.* And when counsel inquired as to whether any of the prospective jurors felt nervous or afraid when encountering a black person, one juror raised his hand. *Id.* at ¶ 9. The trial court then intervened, advising defense counsel that they could "not turn[] this trial into a racial incident." *Id.* Thereafter, the defense was not permitted to ask any additional questions on the topic of racial bias, although the trial court itself separately examined the juror who raised his hand in chambers. *Id.* at ¶ 11. The juror suggested that African-Americans committed a higher percentage of crime that he observed in his job, but said he did not want to discriminate against anyone. *Id.*

**{¶48}** In reversing Belmon's convictions, the court of appeals held that Belmon was provided an insufficient opportunity to question jurors as to potential racial bias, noting that one juror eventually indicated he could not be fair and impartial in response to an initial question about race. *Id.* at ¶ 14. The court identified areas that warranted additional inquiry, including the responses of the juror who raised his hand. *Id.* at ¶ 18. But the trial court "interrupt[ed] this line of examination and prohibit[ed] defense counsel from exploring this topic," thereby precluding the defense from meaningfully conducting voir dire. *Id.* at ¶ 19.

**{¶49}** In contrast, the trial court here did not entirely foreclose questions on race. Rather, it foreclosed a "lecture." And defense counsel was not attempting to ask a question when the trial court intervened. Rather, defense counsel was attempting to "share something" with the jury. The defense was still permitted to ask prospective jurors questions that explored their fitness to serve as jurors, including questions that might explain the potential explicit racial biases they had already disclosed. But

19

counsel indicated he would abandon the topic of race entirely, rather than asking the questions the trial court's instruction would have permitted.

**{¶50}** Personal biases grounded in race, ethnicity, gender, or religion remain genuine concerns in today's society and, as such, are appropriate subjects for voir dire. *State v. Rodgers*, 2008-Ohio-2757, ¶ 94 (11th Dist.), quoting *Jones*, 20 Ohio App.3d at 332. *See Gomez v. United States*, 490 U.S. 858, 873 (1989) ("Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice or predisposition about the defendant's culpability[.]"). (Cleaned up.) Nothing in our opinion should be read to permit trial courts to blanketly exclude implicit and explicit bias as valid lines of inquiry in voir dire.

**{¶51}** Given the racial dynamics in this case, the trial court could have afforded counsel more latitude to delve deeper into jurors' potential prejudices. On this record, however, we cannot say that the trial court abused its discretion by redirecting counsel away from a "lecture" on race, while leaving open the opportunity to ask questions about explicit racial bias that addressed jurors' ability to serve impartially.

### 2. *Overruling of defense counsel's request to strike Prospective Juror Number 6 for cause*

**{¶52}** Predictably, the topic of firearms arose repeatedly during voir dire. The prosecutor mentioned the assassination attempt against then-former President Trump and asked if any of the venire had any strong feelings on the topic. All of the jurors except Prospective Juror Number 6 either eventually indicated that a person convicted of a felony had a right to use a gun in self-defense or stayed silent on the matter. But, when questioned by defense counsel, Prospective Juror Number 6 opined

that a convicted felon did not have the right to use a gun in self-defense. To follow up, counsel asked whether this opinion would interfere with Prospective Juror 6's ability to fairly assess Harris's self-defense claim. He responded by emphasizing that a convicted felon was breaking the law by having a firearm. He indicated this was a firmly-held belief.

{¶53} Defense counsel moved to strike Prospective Juror Number 6 for cause. Upon questioning by the prosecutor, the juror indicated he could apply the law supplied by the judge regardless of his personal opinion and could be fair and impartial. Upon further questioning by the judge, the prospective juror reiterated that he could follow the law, regardless of his opinion. Defense counsel's motion to strike the juror for cause was subsequently overruled. Thereafter, defense counsel exercised his first peremptory challenge to remove Prospective Juror Number 6.

{¶54} Harris argues that the trial court abused its discretion in denying the motion to strike Prospective Juror Number 6 for cause. He contends that the juror's view—that an individual with a prior felony conviction forfeits the ability to claim self-defense with a firearm—evinced a clear bias against him. Harris felt so strongly that Prospective Juror 6 could not be fair that he used his first peremptory challenge among three he exercised to excuse the juror. Harris thus concludes that the denial of his motion to strike for cause was prejudicial.

{¶55} But Harris did not use all of his peremptory challenges. He was given four, and he exercised three. *See* Crim.R. 24(D) (allocating four peremptory challenges per side in a felony criminal case that is not a capital case). A defendant who is not forced to use all of his peremptory challenges based on the trial court's denial of a challenge for cause cannot complain of prejudicial error on appeal. *State v. Hale*, 2008-Ohio-3426, ¶ 87. This is because, by electing not to use all available

peremptory challenges, a defendant essentially acquiesces in the final jury that is selected. *State v. Wilson*, 2012-Ohio-3098, ¶ 96 (2d Dist.), citing *State v. Carter*, 21 Ohio St.2d 212, 214 (1970).

**{¶56}** Harris waived his ability to argue prejudice as a result of the trial court's ruling regarding his for-cause challenge to Prospective Juror 6. But even if he didn't, no prejudice resulted. After the juror expressed his belief that individuals with felony convictions could not use guns in self-defense, the trial court elicited representations from the juror that he could follow the law and be fair and impartial despite this opinion. The trial court clearly believed the juror, as it denied the challenge to his ability to serve. Because the trial court was in the best position to observe the juror's demeanor and veracity, we defer to the trial court's determination as to the juror's credibility. *State v. Depew*, 38 Ohio St.3d 275, 280 (1988), quoting *Wainwright v. Witt*, 469 U.S. 412, 426 (1985); *State v. Knuff*, 2024-Ohio-902, ¶ 75, quoting *State v. Madison*, 2020-Ohio-3735, ¶ 42.

**{¶57}** Harris's third assignment of error is overruled.

### D. *Prosecutorial Misconduct*

**{¶58}** In his fourth assignment of error, Harris contends the assistant prosecutor engaged in misconduct during closing arguments by materially misrepresenting the law on aggravated murder and self-defense, making improper inferences about Harris's intentions, and playing a video not in evidence for the jury.

**{¶59}** Harris objected when the prosecution argued he was the initial aggressor because he engaged C.W. first and when the prosecution played the challenged video before the jury on rebuttal closing. Both objections were overruled. We therefore review this alleged misconduct to determine whether it was improper and if so whether it prejudiced Harris's substantial rights. *See State v.*

*Smith*, 2025-Ohio-3131, ¶ 48 (1st Dist.).

**{¶60}** Conversely, Harris failed to object to the alleged misstatements of law made by the prosecutor during closing arguments, meaning our scrutiny is confined to plain error review as to those statements. *State v. Carter*, 2017-Ohio-1328, ¶ 12 (1st Dist.) ( "[a] defendant's failure to object to an allegedly improper statement by the prosecutor forfeits all but plain error"). To establish plain error, a defendant must demonstrate that the outcome of the proceedings would have been different absent the alleged misconduct. *Id.*; Crim.R. 52(B).

**{¶61}** Prosecutorial misconduct only yields reversible error where it deprives the defendant of a fair trial. *See State v. Lang*, 2011-Ohio-4215, ¶ 155. The central inquiry is whether the prosecutor's remarks during closing arguments were improper and prejudicial to the substantial rights of the accused. *State v. Shelton*, 2023-Ohio-2458, ¶ 12 (1st Dist.). The remarks must be evaluated in the context of the entire trial and not in isolation. *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001). The focal point is the fairness of the trial rather than the culpability of the prosecutor. *Lang* at ¶ 155, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Moreover, "[i]t must be clear beyond reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty." *State v. Grimes*, 2005-Ohio-203, ¶ 18 (1st Dist.), citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), and *Treesh*.

**{¶62}** "The purpose of closing argument is to summarize the evidence at trial. Attorneys argue what conclusions the finder of fact should draw from that evidence." *John F. Bushelman Constr. v. Glacid Group*, 1996 Ohio App. LEXIS 2624, *9 (1st Dist. June 26, 1996). Generally speaking, prosecutors are afforded a wide degree of latitude during closing arguments. *See State v. Richey*, 64 Ohio St.3d 353, 362 (1992). They may freely address what the evidence has shown and what reasonable inferences may

be drawn from that evidence. *State v. Lott*, 51 Ohio St.3d 160, 165 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). It is well-settled that closing arguments are not evidence. *State v. Frazier*, 73 Ohio St.3d 323, 338 (1995). Here, the trial court instructed the jury as much.

{¶63} With regard to prosecutorial misconduct in closing argument, Harris first takes issue with the prosecutor's assertion that, in asserting self-defense, "Harris essentially admits to both murder charges and the underlying felonious assault." He argues that this constituted a misstatement of law because "[t]he elements of the crime and the existence of self-defense are separate issues." *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). After making this statement, the prosecutor invited the jury to decide whether Harris's self-defense claim was credible and whether the State disproved self-defense beyond a reasonable doubt.

{¶64} In addition, Harris takes issue with the prosecutor asserting, "So you'll see that Count 1, aggravated murder. The State of Ohio charges Christopher Harris with what is termed purposeful aggravated murder. Simply put, Christopher Harris caused the death of [C.W.]." This was wrong, according to Harris, because it left out the element of prior calculation and design. But the prosecutor defined that element for the jury: "It means the purpose of the cause of death was reached by a purpose of reasoning." And she further stated, "[Y]ou'll look at all of the definitions, especially for aggravated and prior calculation and design. . . . Again, prior calculation and design will be defined for you by the judge[.]"

{¶65} We view these statements in the context of the entire trial to ensure a fair proceeding. *Treesh*, 90 Ohio St.3d at 464; *Lang*, 2011-Ohio-4215, at ¶ 155. The prosecutor may not have worded certain legal concepts with precision during closing arguments. But in the context of the entire trial, these isolated remarks did not impact

the fairness of Harris's trial. Moreover, to the extent they had any impact on the jury at all, the trial court rectified any imprecision in the prosecutor's remarks by repeatedly instructing the jury that closing arguments were not evidence and by properly instructing the jury on the law. We see no plain error as a result.

{¶66} We next turn to the alleged misconduct to which Harris did object. Relying on our decision in *Mitchell*, 2023-Ohio-2604, at ¶ 21 (1st Dist.), Harris faults the prosecutor for wrongly insinuating that he was the initial aggressor. He likens his case to *Mitchell*, in which the victim was the initial aggressor because he used his deadly weapon first. *See id.*

{¶67} But *Mitchell* does not control or limit the prosecution's ability to argue against self-defense in closing argument of any particular case. Self-defense cases are necessarily fact-specific. Here, the State elicited evidence showing that Harris targeted C.W. from the moment he stepped out of his vehicle and pointed his gun. The prosecutor was free to comment on this evidence in closing argument.

{¶68} Finally, Harris challenges the fact that the prosecutor played a video before the jury that was not in evidence. Over defense objection, the prosecutor played a segment from a video that was admitted by the defense in which officers on scene refer to both Harris and C.W. as "victims." That particular segment, however, had not been played for the jury during trial.

{¶69} In *State v. Crump*, 2021-Ohio-2574 (1st Dist.), we addressed a scenario where defense counsel cross-examined two officers by playing "relevant" portions of an incident that was captured on their body-worn cameras and saved to a DVD. *Id.* at ¶ 6. We noted that, "[a]lthough the DVD accepted into evidence contained additional footage from the officers' cameras, defense counsel identified 'for the record' the authenticated segments he had played in court." *Id.* At oral argument in *Crump*,

appellate counsel pursued an argument against her client's failure to disclose conviction based on footage that was on the DVD but not viewed by the trial court during the bench trial. *Id.* at ¶ 19. We declined to consider the footage, noting that our record was confined to the evidence considered by the trial court. *Id.*, citing *State v. Ishmail*, 54 Ohio St.2d 402 (1978). The trial transcript in that case expressly limited the admitted footage to the "relevant" portions identified in the record. *Id.* We therefore declined to entertain the argument tendered by appellate counsel based on footage outside these admitted portions. *Id.*

{¶70} This case is distinct from *Crump*. Here, there were no "relevant" portions of footage identified for the record or time stamps given for the portions of either video played in open court. On the contrary, the trial court admitted the entire exhibit into evidence and stated it was "allowed to be played for the jury." As a result, the prosecutor's act of playing a portion of the admitted exhibit during rebuttal closing did not result in error.

{¶71} Harris's fourth assignment of error is overruled.

### E. Jury Instructions

{¶72} In his fifth assignment of error, Harris asserts that the trial court erred in instructing the jury on defense of property. He maintains that defense of property was not at issue in the case and that the instruction served only to confuse the jury in assessing his self-defense claim.

{¶73} We review a trial court's ruling on a contested jury instruction for an abuse of discretion. *State v. Houston*, 2020-Ohio-5421, ¶ 34 (1st Dist.). Again, an abuse of discretion connotes a ruling that is arbitrary, unreasonable, or unconscionable. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 33.

{¶74} The parties discussed jury instructions on the fifth day of trial, outside

the presence of the jury. The prosecution requested an instruction conveying that lethal force was not appropriate to defend property in accordance with black letter law. Defense counsel countered that such an instruction was not contemplated by the facts of the case and was not relevant to the issues before the jury. The prosecutor replied it was clear that Harris approached C.W. to inquire what he was doing because Harris believed C.W. was breaking into cars. The trial court agreed to include the defense of property instruction because it was a correct statement of the law, and the court reasoned it could be applicable to the case.

{¶75} We see no abuse of discretion in the trial court's ruling. Harris testified on direct examination that his neighbor often told him how her outdoor camera captured footage of people breaking into cars or people running around with hoods on, and other suspicious things of the sort. According to Harris, this put him on alert. He testified that C.W. was "fidgeting and messing with stuff" inside a Cadillac he did not recognize and he suspected the man wiped the handle of the vehicle to get rid of fingerprints. According to Harris, he did not know what the man was doing, if the man was waiting to harm someone, if he was trying to enter someone's house, or if he was going through someone else's car. Per his own version of events, Harris confronted the man to determine what he was doing and to get him to leave.

{¶76} On these facts, the trial court did not abuse its discretion in issuing the requested jury instruction regarding defense of property. As the Ohio Supreme Court has directed, "[r]equested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240. We see no error in the trial court's defense of property instruction.

**{¶77}** Accordingly, Harris's fifth assignment of error is overruled.

### *F. Impartiality of the Trial Court Judge*

**{¶78}** In his sixth assignment of error, Harris maintains the trial court erred in denying his motion for a mistrial and motion for new trial due to bias exhibited by the court against him. Trial court rulings on motions for a mistrial and motions for new trial are both subject to abuse-of-discretion review. *State v. Johnson*, 2019-Ohio-4422, ¶ 12 (1st Dist.) (mistrial); *State v. Jones*, 2024-Ohio-5896, ¶ 17 (1st Dist.) (new trial).

**{¶79}** To be sure, the record reveals that Harris's trial was contentious. At one point, the trial court repeatedly ordered defense counsel to get to the point in his questioning of State's witnesses. At another, the trial court admonished Harris's attorney, "I'm asking you to follow the rules and one of the rules right now is to ask your next question, please." Defense counsel placed on the record that the judge grew visibly exasperated and put his head in his hands. Counsel also maintained the judge was displaying facial expressions and body language that prompted objections by the prosecution. One of the assistant prosecutors interjected that she did not recall that, but counsel said he and his cocounsel both saw it. These interactions prompted defense counsel to declare, "I have never been chastised in this 37 years [sic] in the manner which I was chastised in this courtroom in front of this jury without first a sidebar or anything else."

**{¶80}** Exchanges of this tone and nature took place throughout the trial between defense counsel and the trial court. In response, the trial court noted for the record that it wholeheartedly disagreed with many of counsel's accusations, which the trial court described as incorrect and out of line. The trial court offered that it had been trying to follow the rules and act in a professional manner. When the trial court

said it had had enough, it meant both sides, according to the judge.

**{¶81}** Harris moved for both a mistrial and a new trial under Crim.R. 33(A)(1) and (6), arguing that the trial court was biased against him. The trial court denied both motions. He alleges both were denied in error. He further alleges that he was entitled to have the trial judge recused and the matter tried before a neutral decision-maker.

**{¶82}** But rather than a mistrial or new trial motion, the proper vehicle to address potential judicial bias in pending case is an affidavit of disqualification under R.C. 2701.03. *State v. Loudermilk*, 2017-Ohio-7378, ¶ 18 (1st Dist.), quoting *State v. Johnson*, 140 Ohio App.3d 385, 391 (1st Dist. 2000) ("[g]enerally, the proper avenue for redress when a party believes that the trial judge is biased is the filing of an affidavit of bias and prejudice with the Supreme Court of Ohio"). We therefore cannot entertain the argument that the trial judge should have been removed for bias. *See Johnson* at 391.

**{¶83}** Our review is therefore limited to whether the trial judge's actions in overseeing the instant case violated Harris's due process rights and precluded him from having a fair trial. *Loudermilk* at ¶ 20.

**{¶84}** Judicial bias is evinced by "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *Id*. at ¶ 21, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus. "Judges are presumed not to be biased or prejudiced toward those appearing before them, and a party alleging bias or prejudice must present evidence to overcome the presumption." *State v. Smith*, 2024-Ohio-2187, ¶ 10 (1st Dist.),

quoting *State v. Sharp*, 2020-Ohio-3497, ¶ 11 (12th Dist.). This presents a high bar. *State v. Terry*, 2025-Ohio-1195, ¶ 25 (1st Dist.). "The evidence must demonstrate an appearance of bias or prejudice compelling enough to overcome the presumption of judicial integrity." *Smith* at ¶ 10, quoting *Sharp* at ¶ 11.

{¶85} Here, both Harris's attorney and the prosecutor zealously represented their positions. Both drew multiple objections throughout the proceedings, some of which were sustained, and some of which were overruled. True, the trial court appeared to grow frustrated on occasion as the parties repeatedly clashed. And the court did admonish defense counsel in front of the jury at times. However, "[c]omments by the trial court 'that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'" *Terry* at ¶ 25, quoting *State v. Escobar*, 2021-Ohio-4001, ¶ 38 (1st Dist.), quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994). Nor do "expressions of impatience, dissatisfaction, annoyance, and even anger" amount to partiality. *Liteky* at 555-556.

{¶86} The trial court's genuine efforts to manage the trial did not amount to judicial bias. Harris's sixth assignment of error is overruled.

### G. Cumulative Error

{¶87} In his seventh assignment of error, Harris contends that cumulative error denied him a fair trial.

{¶88} "The doctrine of cumulative error allows a conviction to be reversed if the cumulative effect of errors, deemed separately harmless, deprived the defendant of his right to a fair trial. The doctrine of cumulative error is inapplicable where there are not multiple instances of harmless error." (Cleaned up.) *State v. Railey*, 2024-Ohio-5502, ¶ 57 (1st Dist.), quoting *State v. Johnson*, 2019-Ohio-3877, ¶ 57 (1st Dist.).

**{¶89}** In assessing Harris's first through seventh assignments of error, we have not identified any error, much less harmless error. Accordingly, Harris's seventh assignment of error is overruled.

### H. *Bruen*/Second Amendment

**{¶90}** In his eighth assignment of error, Harris asserts that the trial court erred in overruling his motion to dismiss the weapons-under-disability charge on Second Amendment grounds without holding a hearing. He contends that the lack of a hearing deprived him of the ability to establish that he fell outside the category of "dangerous persons" despite his prior conviction for felonious assault.

**{¶91}** The record reflects that a hearing did take place. The trial court's order denying Harris's motion to dismiss indicates that "the Court conducted a hearing on the Motion in open court." Our record contains no transcript of the hearing, thus we presume the regularity of the proceedings below. *See State v. Ralls*, 2022-Ohio-2110, ¶ 9 (1st Dist.). We assume the trial court's entry accurately reflected the proceedings.

**{¶92}** Harris's eighth assignment of error is overruled.

### I. *Sentencing*

**{¶93}** In his ninth assignment of error, Harris mounts three challenges against his sentence. Specifically, he attacks the trial court's running of the individual sentences consecutively, the omission of jail-time credit from the sentencing entry, and the forfeiture of the firearm.

**{¶94}** Pursuant to R.C. 2953.08(G)(2), a reviewing court may modify or vacate a felony sentence only if it finds by clear and convincing evidence that the record does not support the trial court's findings or the sentence is contrary to law. *State v. Brunson*, 2022-Ohio-4299, ¶ 69.

### 1. Consecutive sentences findings

**{¶95}** Under Ohio law, there is a general presumption in favor of concurrent service of prison terms. *See State v. Bonnell*, 2014-Ohio-3177, ¶ 23; R.C. 2929.41(A). In order to justify consecutive sentences, the trial court must make the findings outlined in R.C. 2929.14(C)(4). Namely, the court must find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) at least one of the three findings set forth in R.C. 2929.14(C)(4)(a)-(c) applies.

**{¶96}** The judgment entry of sentence ordered Harris to serve the 36-month term on the weapons-under-disability count consecutively to the 20-year-to-life term on the aggravated murder count. The requisite consecutive sentence findings were recited in open court at the sentencing hearing:

> And considering 2929.14 of the Ohio Revised Code, the Court finds consecutive sentences are necessary to protect the public from future crime and punish the offender. And consecutive sentences are not disproportionate to the seriousness of the offense, conduct and the Defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. So therefore the 36 months will run consecutive to Count 1.

Harris correctly notes that these findings were not contained in the judgment entry of sentence as the law requires. *See Bonnell* at ¶ 29, citing *State v. Brooke*, 2007-Ohio-1533, ¶ 47 (a court speaks through its journal entries). This clerical omission can be corrected via a nunc pro tunc entry on remand. *See State v. Morris*, 2023-Ohio-4622, ¶ 44-45 (1st Dist.), quoting *Bonnell* at ¶ 30. The State concedes the error.

{¶97} Harris additionally argues that the record does not support the consecutive sentences findings articulated by the trial court at the sentencing hearing. Given our determination that the trial court did not correctly enter consecutive sentencing findings under R.C. 2929.14(C)(4), this argument is premature, and we do not consider it.

### 2. *Jail-time credit*

{¶98} It is incumbent upon the trial court to calculate the number of days of jail-time credit served by the defendant and to incorporate those days into the judgment entry of sentence. *State v. McDonald*, 2015-Ohio-1911, ¶ 15 (1st Dist.); R.C. 2949.08(B). The failure to do so constitutes plain error. *State v. Merz*, 2023-Ohio-582, ¶ 14 (1st Dist.), quoting *State v. Bowden*, 2015-Ohio-3740, ¶ 18 (1st Dist.).

{¶99} The record reveals that Harris was held in custody prior to sentencing. Nonetheless, the trial court failed to calculate and include jail-time credit in the sentencing entry as required by law. The State concedes the error. We remand for resentencing so that the court can notify Harris of the jail-time credit to which he is entitled in open court. *See State v. Thompson*, 2025-Ohio-2168, ¶ 90 (2d Dist.).

### 3. *Forfeiture of the firearm*

{¶100} The sentence imposed by the trial court ordered, "Defendant's gun is to be forfeited." Harris challenges this component of his sentence on the basis that the indictment lacked any forfeiture specification, as required by law. *See* R.C. 2941.1417 and 2981.04.

{¶101} Harris lacks standing to challenge the trial court's forfeiture order, because the gun was not his. *See In re 1995 Mercedes C280*, 2006-Ohio-1565, ¶ 4-5 (1st Dist.); *State v. Langston*, 2012-Ohio-6249, ¶ 9 (6th Dist.). Harris repeatedly testified at trial that the pistol he used to shoot C.W. belonged to his girlfriend.

Because he denied ownership of the firearm, he cannot challenge its forfeiture by the trial court.

### *Conclusion*

{¶102} As explained in this opinion, we overrule Harris's first through eighth assignments of error and uphold the findings of guilt in their entirety. But, as conceded by the State, we find error in parts of Harris's sentence. We sustain Harris's ninth assignment of error in part and overrule it in part and remand the cause for a limited resentencing.

Judgment affirmed in part, reversed in part, and cause remanded.

**NESTOR** and **MOORE, JJ.,** concur.